I would like to reserve three minutes at the end of my time for rebuttal. I want to point out that unlike the previous case, this is not a sufficiency of the evidence case, this is a cumulative error review. It requires a big picture look at the evidence that was presented and how it was presented to ascertain the reliability of the jury's verdict. And although a prosecutor's opening statement is not evidence, it does provide a road map to explain the government's theory of the case and what evidence was going to be relied on. And in this particular instance, in this case, the prosecutor specifically identified what the evidence was that he was going to rely on. He said that the evidence would show that the appellant personally submitted fraudulent claims, personally signed checks used in a money laundering conspiracy that the appellant was not indicted for, and over a six-week period defrauded the government along with his absent co-defendant of approximately $600,000. Now the only evidence, direct or circumstantial, of any of these facts was the testimony of the FBI agent Whitman. She was the second witness. Her testimony was unequivocal. She on that narrow focus of time, she concluded, and this is what she told the jury, that whoever controlled the bank accounts during the money laundering conspiracy was also the person who had submitted, actually submitted, the fraudulent claims. She told the jury that she had seen a store security video for Ferragamo that showed the appellant signing a debit card receipt on February 14, 2011. So based on that videotape, she knew that was one sample, one authenticated signature using the name Jorge Luis that the appellant had signed. Of course, the jury also saw that videotape. So their knowledge was equivalent to her knowledge. Other than that, she didn't know and nor could she testify as to which of all of the thousands of other signatures she looked at were made by him or somebody else. However, the government points out... Wait a minute. I thought she did testify based on the signatures. She had had... A career complaint and she shouldn't have been allowed to do that. Exactly. But she did testify based on the signatures that whoever signed that also signed a bunch of the claims. That's right. Okay. That's right. So the government points out that she never really said he signed the documents. She said that the signatures were consistent. Now, using the word consistent, that's the kind of verbiage that an expert would use after making, describing their conclusion after making a comparison. But it is not the verbiage that a witness testifying as a lay opinion witness who had demonstrated or testified to facts showing adequate familiarity would use. Somebody who is adequately familiar with the handwriting would say, I recognize that handwriting. I've seen it before, even though they may have never seen the document. An expert has never seen any of the documents and they are making a scientific analysis comparing the signatures to come up with their conclusion. I guess I'm having a hard time with both why this verbiage matters and what the difference is between saying I recognize that signature and implicitly saying, comparing it to the ones I've seen, it's the same signature. I actually agree with you, Your Honor. There is no difference. But the government pointed out, even summarizing in its brief, that she used the word consistent with. So they took issue with our argument that she identified the appellant as the person who signed these documents. And they said, well, she actually said it was consistent with. And I wanted to point out that that is consistent with an expert opinion. She concluded... Why is it not consistent with lay witness opinion testimony? I can explain to you exactly why. If I am a lay witness and I'm presented with a piece of a document that I've never seen before, and it is the handwriting on that document is my spouse, well, I've seen hundreds, thousands of examples. I don't need to compare the document, the new document, with all the other examples. I recognize my spouse's handwriting. I don't have to compare it with anything else she did. I mean, she was just being more careful. Because even though, even if you would say that's my son's handwriting, it's possible it wasn't. It could have been a forger. Well, that is true. It could have been. But her knowledge, her testimony was not helpful. Her knowledge about that handwriting, about that document... That's a whole different problem. And it seems to me, you know, a strong one. Because I don't know what she was saying other than what anybody else looking at those pieces of paper could say. But that's not where you started from. Well, I think that the record made it appear that she was testifying as an expert under Rule 702. There was no effort to have her qualify or to lay the foundation under Rule 701 or Rule 901 as a lay opinion expert. But that, in fact, was what the government argued. And from our position is, is that the requirements of either rule were not satisfied. She did not have adequate familiarity with the writing to be able to recognize it and to give a lay opinion. So that responds to that argument made by the government. She also concluded, Ms. Whitman, the FBI agent, that during that eight-week period she testified about, that an appellant used the same debit card that was used at Ferragamo on February 14th to withdraw thousands of dollars from the OrthoMed business accounts at ATMs. And this was based on the fact that the ATMs were located mostly in Glendale. And he lived in Glendale. And that was her opinion. Now, her testimony, her testimony was the background against which, against which all the percipient witnesses testified. I mean, she did look at an awful lot of these pieces of paper. And she did have an authenticated example of his handwriting. I mean, it seems to me what you're really arguing, and it might make some sense except that it isn't consistent with the case law, is that this wasn't based on a familiarity that was not acquired for the current litigation. I mean, it wasn't something that she encountered in life. But that's our case to say otherwise. I think that if she had acquired, there are, there is case law that looks at a case agent testifying as a lay opinion witness on handwriting issues based on, on rule 701. But in- All the circuits that have addressed the issue have permitted lay opinion testimony on that question, right? And I don't dispute that it's permitted, assuming that the proper foundation has been laid. That foundation, under rule 901, must consist of adequate facts showing, showing that she acquired familiarity with the handwriting and showing how she acquired familiarity with it. And what she testified- She didn't testify that she was investigating the case and that she looked at all of these checks in the course of the investigation and she saw that they were all, that many of them had the same handwriting. And then she looked at this other one and she said, oh, that's the same handwriting. Isn't that much in the record? She only had one authenticated sample, which was the same sample that the jury had. So her knowledge, which would provide her with the sufficient familiarity to give a lay opinion, was not any greater than the jury's. And that's- That gets back to the helpfulness question. So maybe that's where you want to start. That's right. Which is part of the rule. Right. Right. That's right, Your Honor. So against this background, the recipient witnesses- But if you have, if the problem is helpfulness, i.e., I mean, you know, it's certainly part of the standard and it has to be helpful to the jury. And if she doesn't know anything more than the jury does, I mean, do they also have all the other checks before them? Well, they, yes, they were in evidence. But if you look at the record- I understand. You say they didn't really have time to look at it. Right. She told them what to, how to decide the case. We cited the Hearst case in our reply brief, which is kind of an analogous circumstance. She told them how to decide the case. Clearly, based on the volume of the bank records and other signatures, in fact, they could have needed longer to come to a verdict. There's no way that they could have looked at those documents. So, I mean, that's what I was going to ask you. What's the harm in doing something that's not helpful with the jury's suit itself? Because it usurps the function of the jury. It is the jury's job to ascertain that fact. It is not her role to tell them how to decide the case. What the big picture actually showed was that the co-defendant pursued the prior owner of Orthomed offering to buy his business. They met a few times. The co-defendant brought the appellant in. The appellant testified he was there to help because his English was better. He had no desire, no funds with which to purchase the business. There was no evidence suggesting to the contrary and the seller of the business admitted he didn't know where the money came from to purchase his business. The co-defendant offered appellant to compensate him if he would help out at the business. Appellant did so from April 2009 until 18 months later when he left to start graduate school at USC. No evidence of any fraudulent Medicare claims during that time. The government claims were afterwards. One of the claimants or Medicare beneficiaries rather testified that when she got an explanation of benefits form, she called the number for Orthomed and the man that answered had a very thick Russian accent. She was crystal clear and the only person that could have been was the co-defendant and that was in November. The testimony about the fake driver's licenses shows that the co-defendant provided 16 or more fake driver's licenses to at least one of his co-conspirators in the money laundering scheme and a few weeks before then, a fake driver's license was used to rent the mailbox. As we point out in our brief, the bank statements that were not testified about by the FBI agent showed that the co-defendant was renting mailboxes in Arizona and he rented mailboxes in Beverly Hills. This was part of his use. It also shows that on the same day of the Ferragamo purchase, he used an ATM he used two dozen times in Tarzana near where he lived with the same card that was used by the appellant at Ferragamo. We don't know that there weren't two cards. There were two cards. Each had a separate number. The one that the agent identified with the appellant had different numbers because the statements show that they had different numbers. The co-defendant had one and Tasmanian had another? Yes. I thought you were suggesting that somehow the purchases that were attributed to Tasmanian were actually made by the co-defendant. Not the one purchased at Ferragamo, but the other transactions from about October of 2010 when the appellant left the business and went to... Which number were they on? The cards were in the possession. Our position is the cards were in the possession of the co-defendant, which is consistent with the appellant's testimony at trial that on the way to Ferragamo, the co-defendant handed him the card and said, you're allowed to use this for this purchase. But the jury doesn't believe that because they've already heard that he has personally withdrawn funds and done other things. I would like to just address in the two minutes I have left that there is no competent evidence to support these inferences. There is, we believe and our position is that there was a constructive amendment by using this detailed testimony and evidence from the money laundering scheme, which the appellant was not indicted for, that this was a constructive amendment. I don't understand that. They were instructed as to what the actual crime was and that wasn't it. It wasn't, but using that evidence is how they proved fraudulent intent. They said the two were connected and so on. They did, but they didn't say you had to convict him of money laundering. There was no 404B compliance with respect to the money laundering. That's a different argument. That's not a constructive amendment argument. No, it is a related argument because both involve using evidence from something that is not charged to prove the element of the charged offense and that's what occurred here. And that's the constructive amendment and it's also the 404B analysis. As far as Agent Richards is concerned, this is the stricken testimony. This is the stricken summary exhibits. Our position on that is that the judge made a decision. He struck her testimony, stopped her from testifying, struck her testimony as to these specific exhibits and there was no objection or appeal filed by the government to preserve its rights under Rule 103. So the judge is finding that it was prejudicial and he did find that because he expressed concern that the jury believed that her testimony, which he considered to be argument, was actually fact. There's no dispute that it was prejudicial and it was all presented to the jury. The exhibits were published to the jury and when you look at the big picture in a cumulative error case, you have to look at all of that and you're left with what is the strength of the actual admissible evidence and that evidence was speculative. It was not strong but in particular, the appellant testified and none of his testimony would have been found credible, was found credible. They didn't rely on it. They didn't believe his story about what happened on the way to Ferragamo even though the bank record showed that the co-defendant had used that same debit card that day at the ATM near his house. That's why I said there could have been two of them. He used both cards. Excuse me. There could have been two of each card. There's no evidence of that in the record that there were two. That would be speculation as well but the FBI agent testified that he was the one who did it. The appellant. Thank you very much. Thank you. I'll give you a minute. I know I'm over. You are over. We'll give you a minute. Thank you. May I please the court, Ellen Meltzer for the United States. Although opposing counsel argues this is a case of cumulative error, there were no multiple errors to accumulate in this case because the only error in this case was the admission of purported summary exhibits that the court ended up striking and giving a, excuse me, giving an instruction to the jury to cure the error in that case. I'd like to first discuss the handwriting issue. The district court in this case did not abuse its discretion in permitting FBI special agent Amy Whitman to testify that the signature of Mr. Tamazian on the Ferragamo receipt from Beverly Hills on February 14th, 2011 was consistent or the same as the signature on certain pertinent Medicare documents. Specifically, she testified that the signature was the same as on Government Exhibit 4, which was the letter that was signed Jorge Luis to Medicare changing the mailing address of the company to that of Pack and Ship in Northridge. That exhibit is found at Supplemental Record Excerpts, page 67. It was also the same as the Jorge Luis signature on the Medicare site acknowledgment form that was signed before Inspector Mark Baldwin, and that's on Exhibit 5. I do find it strange to allow this evidence. I understand there's support for it, but any knowledge she has about this is just from her investigation of the case. The jury can look at exactly the same thing, and because she's testifying as a layperson, her opinion on that subject isn't really worth any more than theirs is, right? I disagree, Your Honor. In the Harris case in the Sixth Circuit from this year, the court found that in similar circumstances the testimony of an FBI agent that the defendant had signed a threatening letter to a Congresswoman was helpful because that person had spent more time studying the case, studying the unknown signature and the knowns than the jury could. It sounds more like she's an expert. No, she's not an expert, Your Honor, and it was made very clear to the jury that she was not an expert. If it wasn't clear from the testimony produced by the government ... It seems that this was originally intended for ... I live with this person. I know their signature, not something that was acquired on a discreet basis. I understand that it's been allowed. I'm not disputing that it's been allowed, but I'm trying to get underneath the question of at what point does it become not helpful because her knowledge ... and distorting because there is a tendency, even if you say this person is not testifying as an expert, to Well, I guess, first of all, under Rule 901B2, the rule is that, if I can find the exact language, a non-expert's opinion in handwriting is genuine based on a familiarity with it that was not acquired for the current litigation. All of the cases ... I know they say it. I don't understand why it wasn't acquired for the current litigation. Of course it was. I mean, she was investigating, and I suppose it could be that she wasn't going to succeed and there would never be litigation, but presumably it was, at least in part, for the purpose of setting up a case so there could be litigation. With all due respect ... I understand there's case law. I do understand it. I do understand it. The case law is clear that what they mean by not acquired for the purposes of this litigation is not just being presented with the evidence for the purpose of taking the stand and testifying as an expert witness did. In a lay witness case, the person has acquired familiarity, and in all the reported cases in the 8th Circuit, in the 2nd Circuit, in the 11th Circuit, in the 6th Circuit, not being acquired for the purposes of litigation means becoming, and they've talked about it, becoming familiar with the evidence through the course of the litigation. In this case, Ms. Whitman became familiar with the known signature through her investigation of the crime, and that's precisely how the courts have defined it. She became familiar with it because for over two years, she studied the unknown signatures on the Medicare documents, on the banking documents, and on other documents, and looked at the bank records, which had multiple Jorge Luis signatures, and looked at the Jorge Luis signature on the Ferragamo receipt. So, although it might have been acquired for the purpose of an indictment, it certainly was not for the purposes of the instant testimony in court, which she gave. The cases have also discussed, in terms of helpfulness, under Rule 701B, that it's helpful to the jury because that person has spent more time, and she certainly spent more time studying these matters than the jury would possibly do. Did the district court address those prongs in ruling on the ... No, they didn't address it at all, Your Honor. No objection was made? The objection was made on the basis of that she was not an expert, and the judge overruled the objection, but there was no discussion specifically about Rule 701 or 901B2, either during the trial or afterwards. In fact, any error in any admission of this testimony in this case certainly was harmless because as Judge Berzon pointed out, the jury could make an independent judgment about this evidence. The opinion was certainly subject to cross-examination, and Ms. Whitman was vigorously cross-examined about this. In fact, on cross-examination, if it wasn't clear to the jury that she was a lay witness, it certainly became crystal clear on cross-examination. On page 333 of the transcripts, she was asked, You're not an expert in handwriting analysis, are you? And her response was, No, I just use common sense. And the next question was, But you're not an expert, are you? And she said, No, I'm not. So it was certainly clear to the jury that she was testifying as a lay witness. And the jury could assess the weight, if any, to give to her opinion and could evaluate that opinion. Unless the court has any additional questions on handwriting, I'd like to discuss the constructive amendment question briefly. Contrary to what opposing counsel has just argued, the indictment in this case in the Medicare fraud count specifically alleged that after Medicare deposited more than $994,000 in Orthomed's accounts, that co-conspirator McItterian withdrew or caused the withdrawal of cash from Orthomed through multiple checks, each in the amount of less than $10,000 written to fictitious persons. This court made clear in RISC, which your Honor, Judge Gould authored in 2011, that the government is entitled to deduce proof on the full scope of the conspiracy, and that's precisely what we did here. Agent Wittman testified that numerous checks adding up to more than $600,000 were cashed at check-cashing stores, payable to individuals who had absolutely no connection to Orthomed. The parties entered into a stipulation that at the end of 2010 and the start of 2011, Mr. McItterian brought blank checks and fake licenses to a woman by the name of Diana Brigitte, who was a confidential human source for the government, and she cashed the checks and gave him the money, and that she never met with Mr. Tamazian during this period. So the evidence was admitted to prove the full scope of the healthcare conspiracy offense, and the arguments made clear that McItterian was in charge of cashing the checks during the Orthomed scheme. The government never argued in its closing that Mr. Tamazian had cashed any checks or that he brought any that Brigitte gave the money from cash checks to Mr. McItterian. The government argued a reasonable inference that Mr. Tamazian likely received some of that money also, because there were no checks that were made payable to him or to Mr. McItterian during the course of the scheme. I'd like to spend a couple of minutes talking about the admission of the exhibits, which were stricken by the The standard review on the summary testimony that was stricken and the curative instruction that the court gave is plain error. And in view of the overwhelming evidence of Mr. Tamazian's guilt, the instruction could not have affected the outcome of the trial or the verdict or interfered with the fairness of the proceeding. There were ten exhibits that were stricken by the court. I believe that six of them related to Medicare beneficiaries. There were photographs of the beneficiaries, a copy of the explanation of benefits, and a little strip at the bottom of each exhibit that showed the amount that had been billed, the amount that had been paid, the false number that was given to Medicare for the DME that was never ordered by the beneficiaries and never provided to them. Except for the photographs, all of that information had been placed before the jury at an earlier time. And the photographs themselves were certainly not inflammatory and could not have affected the verdict in this case. The other exhibits, similarly, with few exceptions, had also been placed before the jury in various forms. The court had previously admitted the Ferragamo receipt, the application to pack and ship, and the Medicare site visit acknowledgement form that Mr. Tamazian had signed. Those were exhibits 47 and 48. The only other information that had not previously been admitted was only on exhibit number 46, which is found at page 521 of the government's record excerpts, and that was the timeline of the various events in this case. The only information on that timeline that had not previously been given to the jury was the date that Orthomed's Medicare privileges were suspended, and that information in and of itself certainly could not have been inflammatory or affected the verdict in this case. There was overwhelming evidence. Again, the district court's problem with this evidence wasn't so much that it was inflammatory or misleading. It's just that it wasn't competent evidence. It was a final argument, not a proper... It had the appearance of being objective when it was really an oral argument. And we can see that, Your Honor. It should not have been placed before the jury. But it certainly could not have affected the verdict in this case. The evidence as to Mr. Tamazian's guilt was overwhelming. From the very beginning, he used false identities in this case. He identified himself as Mike or as Michael. To other employees of Orthomed, he identified himself as Mike or Michael to Mr. Schuchman, from whom he purchased the company. As Mike to Risa... Well, people with strange foreign names sometimes just use local names. But he used multiple names, Your Honor. He used Mike. Mike or Michael. Mike or Michael are all the same thing. He also used Jorge Luis. Well, yes, that's what you're saying. But the Mike or Michael part seems totally benign. Jorge Luis is not so benign. And neither was his use of the word Jack in 2013 in connection with the scheme involving Health Care Corner. Or his handing of a burner phone to Ms. Brigitte to communicate with him concerning Health Care Corner. He also, in terms of his involvement in the company, gave $10,000 cash to Mr. Schuchman to buy the company. He gave him a $15,000 money order at the closing. He rented the mailbox of Pack and Ship, changing the address of Orthomed. He also said that Mr. Schuchman was doing business every day and that he submitted claims to Medicare on his laptop computer. And that he trained Masha Vox, one of the new employees of Orthomed. What about this suggestion, and then we'll be done, that the fraudulent claims weren't made until after he went back to school full-time? His testimony was that he went to school from, I believe, 9 in the morning until 1 in the afternoon, or 8 in the morning until 12. It was a four-hour period. However, Masha Vox, who started employment at the company in July and worked through her last paycheck was dated either October 30th or 31st, 2010, testified that he was present at the business on a regular basis. Is that when the fraudulent claims were made, or they were made starting in... They started at the beginning of October. There were many, many, I don't remember how many hundreds of thousands of dollars during the month of October, and they continued through January. But she testified that even in October, he was present at the business on a regular basis, and that's precisely when the claims spiked. Thank you very much. Thank you for giving me an additional minute. I just want to respond briefly on Harris, that case which was cited by the government's attorney. It really doesn't... It's not contrary to our argument. It supports our argument, because in Harris, the lay witnesses who identified the handwriting gave detailed testimony about how many letters were personally delivered to them by the defendant, and that's how they recognized the handwriting. They had so much exposure to it. Is there a Ninth Circuit case saying that this kind of evidence by agents, investigative agents, counts for 901 purposes? There are a couple of cases in the last couple of years, the Rays-Barrett case and the case last year, excuse me, I'll get you the citation to that, where the court cautioned against this type of testimony. It has to be helpful. That is the 701... That's what I asked you. I asked you whether for 901 purposes, investigatory agents are not doing it for purposes of litigation. I have not found a published case that was directly analogous to this. There are in many other circuits. There are in other circuits, and they are cited, I think, the government cited as well as I did. With respect to... I just wanted to point out, however, that a careful reading of Harris shows that the foundation, and that was the actual objection made at trial in this case. It was not objecting because she's giving expert witness testimony. It was an objection that there was no foundation laid for her opinion, and that is the proper foundation, the proper objection. In fact, the foundation required under 701 and 901 was not laid. Harris does go into what kind of foundation is required. As far as the constructive amendment, the allegation... Thank you both for your arguments.
judges: Gould, Berzon, Steeh